**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| LBT IP II LLC, | |
| Plaintiff, | Case No. 6:21-cv-01210-ADA |
| v. | **JURY TRIAL DEMANDED** |
| UBER TECHNOLOGIES, INC., | |
| Defendant. | |

**UBER TECHNOLOGIES, INC.'S MOTION TO TRANSFER
TO THE NORTHERN DISTRICT OF CALIFORNIA UNDER 28 U.S.C. § 1404(A)**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ......................................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................................... 2

        A.      Procedural History and Parties............................................................................ 2

        B.      The Majority of Relevant Witnesses and Evidence Are Located in the
                Northern District of California—Not the Western District of Texas ................... 4

                1.      Uber's Witnesses and Evidence Relevant to the Alleged
                        Infringement Are Located in the Northern District of California.............. 4

                2.      Third Party Witnesses and Evidence Relevant to the Alleged
                        Infringement Are Located in the Northern District of California.............. 5

                3.      Other Witnesses and Evidence Relevant to Patentability,
                        Enforceability, Damages, and Defenses Are Located in California ......... 6

III.    LEGAL STANDARD..................................................................................................... 8

IV.     ARGUMENT .................................................................................................................. 8

        A.      This Litigation Could Have Brought in the Northern District of California ......... 8

        B.      The Private Factors Weigh Heavily in Favor of Transfer.................................... 9

                1.      Sources of Evidence Are Far More Accessible in the Northern
                        District.................................................................................................... 9

                2.      The Northern District Can Subpoena Third Party Witnesses ................. 11

                3.      The Cost of Attendance for Willing Witnesses Is Far Less
                        Burdensome in the Northern District..................................................... 12

                4.      Other Practical Considerations for Transfer Are Neutral ....................... 13

        C.      The Public Factors Also Weigh in Favor of Transfer......................................... 14

                1.      Administrative Difficulties Relating to Court Congestion Slightly
                        Favor Transfer to the Northern District ................................................ 14

                2.      Local Interests in Having Localized Interests Decided at Home
                        Weigh in Favor of Transfer to the Northern District ............................ 14

                3.      The Other Public Factors Slightly Favor or Are Neutral to Transfer
                        to the Northern District ......................................................................... 15

V.      CONCLUSION............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. Blackberry Ltd.*,
2014 WL 10748106 (W.D. Tex. June 11, 2014) ........................................ 9, 11, 14

*DataQuill, Ltd. v. Apple Inc.*,
2014 WL 2722201 (W.D. Tex. June 13, 2014) ........................................ 14

*Fujitsu Ltd. v. Tellabs, Inc.*,
639 F. Supp. 2d 761 (E.D. Tex. 2009) ................................................ 11

*In re Adobe Inc.*,
823 F. App'x 929 (Fed. Cir. 2020) .................................................. 14

*In re Apple Inc.*,
979 F.3d 1332 (Fed. Cir. 2020) ................................................ 9, 12, 14

*In re Genentech, Inc.*,
566 F.3d 1338 (Fed. Cir. 2009) .................................................. 12, 14

*In re Google LLC*,
2021 WL 4427899 (Fed. Cir. Sept. 27, 2021) ........................................ 13

*In re Google LLC*,
2021 WL 5292267 (Fed. Cir. Nov. 15, 2021) ........................................ 10

*In re Nintendo Co.*,
589 F.3d 1194 (Fed. Cir. 2009) .................................................. 8

*In re TS Tech USA Corp.*,
551 F.3d 1315 (Fed. Cir. 2008) .................................................. 8

*In re Uber Techs., Inc.*,
852 F. App'x 542 (Fed. Cir. July 8, 2021) ........................................ 2, 13, 14, 15

*In re Volkswagen AG*,
371 F.3d 201 (5th Cir. 2004) .................................................. 1, 8, 12

*In re Volkswagen of Am., Inc.*,
545 F.3d 304 (5th Cir. 2008) .................................................. 8, 13

*Kleiner v. Sw. Air. Co.*,
2008 WL 4890590 (W.D. Tex. Nov. 4, 2008) ........................................ 11

*Parus Holdings Inc. v. LG Elecs. Inc.*,
2020 WL 4905809 (W.D. Tex. Aug. 20, 2020) ........................................ 10, 12

*Wireless Recognition Techs. LLC v. A9.com, Inc.*,
2012 WL 506669 (E.D. Tex. Feb. 15, 2012) ........................................ 14, 15

*XY, LLC v. Trans Ova Genetics*, LLC,
2017 WL 5505340 (W.D. Tex. Apr. 5, 2017) ........................................ 9

**Statutes**

28 U.S.C. § 1404(a) .................................................. 1, 8

**TABLE OF AUTHORITIES**

*(continued)*

**Page(s)**

**Rules**

Fed. R. Civ. P. 45(c)(1)............................................................................................................. 11

## I.   **INTRODUCTION**

Uber moves to transfer this case to the Northern District of California. The "convenience of the parties and witnesses" and "the interests of justice" weigh heavily in favor of transfer to the Northern District of California, where the relevant witnesses, documents, and other evidence—including those of Plaintiff LBT IP II LLC ("LBT II")—are concentrated and more easily accessed. 28 U.S.C. § 1404(a); *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). Neither party resides in this District and—other than a single named inventor, whose alleged presence in the District appears designed to give the impression that venue is convenient—no relevant witness, documents, or other sources of evidence call the Western District of Texas home.

Uber's technology and ride-share marketplace were designed and developed in the Northern District of California. The company's Bay Area headquarters and engineering facilities are the heart of all engineering efforts relevant to the accused functionalities, and are where almost all of the Uber employees with knowledge of those accused functionalities reside and work. The Northern District is also home to important third-party witnesses from Google and Apple, whose mapping services, location APIs, and/or operating systems appear to be accused by LBT II, as well as potential sources of prior art. Just a few hours away, in Southern California, reside other important witnesses and sources of evidence, including Location Based Technologies, Inc.—the original assignee of the asserted patents and developer of the PocketFinder product discussed in the complaint—and its employees and Directors. Also located in Southern California are two of the asserted patents' named inventors, and individuals involved in the design and development of potential prior art systems and publications, including at Qualcomm Corp., which was particularly active in the art relating to the inventions claimed in LBT II's patents.

Because the overwhelming weight of evidence and witnesses located in the Northern District of California—with no connections to anchor the case in this District—§ 1404(a) counsels

1

strongly in favor of transfer.  Indeed, a recent case against Uber was transferred from this District to the Northern District under similar facts. *In re Uber Techs., Inc*., 852 F. App'x 542, 543-44 (Fed. Cir. July 8, 2021).  The same outcome should result here.

## II.    FACTUAL BACKGROUND

### A.    Procedural History and Parties

On November 19, 2021, LBT II filed a complaint against Uber, alleging infringement of U.S. Patent Nos. 7,728,724 (the "'724 Patent"), 7,598,855 (the "'855 Patent"), 8,531,289 (the "'289 Patent") and 8,224,355 (the "'355 Patent") (collectively, the "Asserted Patents"). Compl. ¶ 2. On January 27, 2022, Uber filed a Rule 12(b)(6) motion to dismiss for failure to sufficiently plead direct, joint, and induced infringement.  *See generally* Dkts. 18, 28.

LBT II is a Texas company, whose principal place of business is not an actual LBT II office space, but rather the address of its registered agent in Graham in the Northern District of Texas. Compl. ¶ 3; Ex. 1[1]. LBT II was created and incorporated on June 19, 2020, just over a year before filing this case, Ex. 2, and its connections to the state are superficial at best. Indeed, LBT II identifies only a single contact in this District: one of the Asserted Patents' five named inventors, Joe Scalisi, who is alleged to be a "current resident of Austin, Texas." Compl. ¶ 33. But public records indicate that Mr. Scalisi came to the District around June 2021, shortly before LBT II filed its complaint. Ex. 3 at 3; *see also* Ex. 4. Before then, Mr. Scalisi resided in Southern California, Ex. 3 at 2, as do at least two of the other named inventors, and many of the witnesses and evidence related to the Asserted Patents.

Irvine, California-based Location Based Technologies, Inc. ("LBT Inc.") is the original assignee of the Asserted Patents. Compl. ¶¶ 31-32. LBT Inc. assigned its patent portfolio in 2019

---

[1] All citations to "Ex. __" refer to exhibits of the Declaration of Nancy Schroeder.

to LBT IP LLC, a newly-created entity owned by a secured creditors group. Ex. 5 at 2; Ex. 6 at 3. In exchange, LBT Inc. would receive a share of all net cash flows received from monetizing the portfolio, including the Asserted Patents. Ex. 5 at 2. LBT IP LLC thereafter created and assigned the Asserted Patents to LBT II. Ex. 7; Compl. ¶ 2. On September 17, 2021, LBT II assigned a security interest in the Asserted Patents to LIT-US Chisum 21-A LLC, a Delaware company incorporated on August 6, 2021. Ex. 8 at 3; Ex. 9.

Uber is a Delaware corporation with its principal place of business in San Francisco. *See* Declaration of Natalie Love ("Love Decl.") ¶ 5. Uber employs 4,280 full-time employees in its offices in the Northern District, where Uber pioneered the modern ride-share economy. *Id*. ¶ 7. Although Uber has a few remote employees and a now-closed driver support hub in this District, none of the research, design, or development efforts relating to the accused functionalities has taken place here. *Id*. ¶ 9; Declaration of Bozhena Bidyuk ("Bidyuk Decl.") ¶¶ 8, 24. Nor are any of the remote Uber employees in this District connected to the research, design, or development of the accused functionalities. *Id*. ¶¶ 8, 25.

The complaint alleges that Uber's "ride-hailing and food delivery services" technologies directly and indirectly infringe the Asserted Patents "alone and/or jointly" through use of an "Uber Platform." Compl. ¶¶ 60, 76. This "Uber Platform"[2] is alleged to encompass "computer systems, servers, drivers, and electronic connections and communications with drivers and passengers/riders," including "all such hardware, applications, and functionalities and any related Uber technologies that interface with the Uber Driver and Rider Applications to provide ride-hailing and food delivery services." *Id*. ¶¶ 23-24. According to LBT II, the '724, '855, and '289

---

[2] This so-called "Uber Platform" is LBT II's own meaningless concoction of hardware, software, drivers, and "electronic connections and communications"—a fictional "platform" that ignores Uber's actual technology and independent, principal components. *See* Dkt. 18 at 1-2.

Patents generally involve requesting, receiving, determining, and tracking the locations of riders or drivers via the users' tracking devices with the help of GPS, satellite, or triangulation methods. *Id*. ¶¶ 43-44, 46-47, 49-50. The '355 Patent is allegedly directed to a webpage providing requested location information on a user interface comprising mapping tiles from multiple mapping service providers. *Id.* ¶¶ 52-53.

**B. The Majority of Relevant Witnesses and Evidence Are Located in the Northern District of California—Not the Western District of Texas**

**1. Uber's Witnesses and Evidence Relevant to the Alleged Infringement Are Located in the Northern District of California**

The witnesses and evidence relating to the accused Uber Platform are predominantly located in the Northern District, home to Uber's San Francisco headquarters and the heart of Uber's R&D and engineering operations for the accused Uber Platform functionalities. Bidyuk Decl. ¶¶ 7-9. The majority of Uber's engineers reside and work in the Northern District, including those who designed, developed, and continue to maintain and improve the accused functionalities. Love Decl. ¶¶ 7-8; Bidyuk Decl. ¶¶ 7-9. These employees include engineers and product managers in the Driver, Rider, Maps, Location, Trip Context, and Sensor Mobile Teams:

> The Driver Team is responsible for the driver experience during trip request and rider pick-up and drop-off, as well as the back-end location and communication functionalities for the Driver application. Members of this team have relevant knowledge of driver location determination and tracking, as well as any sharing of driver or rider locations as apparently accused by LBT II. Bidyuk Decl. ¶¶ 10-11.

> The Rider Team is responsible for the rider's experience and platform functionalities for the Rider application. Members of this team have relevant knowledge of rider location determination, tracking, and sharing. *Id.* ¶¶ 12-13.

> The Location, Trip Context, and Sensor Mobile Teams are responsible for collection, processing, and provision of location data and related features within the Uber system. Members of these teams have relevant knowledge of the determination, modification, and use of location data, as apparently accused by LBT II. *Id.* ¶¶ 14-17.

> The Maps Team is responsible for the display of mapping information in the Driver and Rider applications. Members of this team have information relevant to the mapping features apparently accused by LBT II. *Id.* ¶¶ 18-19.

4

To the extent Uber markets the accused features, the relevant product marketing employees are based in Uber's San Francisco headquarters. *Id*. ¶ 21. Uber's employees knowledgeable about finances relevant to the accused functionalities are also at Uber's headquarters. *Id.* ¶ 22.

By contrast, none of the research, design, or development of the accused functionalities has taken place in this District. *Id.* ¶¶ 8, 24; Love Decl. ¶ 8. LBT II's complaint identifies only a single Uber facility in the District—a Greenlight Hub in Austin—where Uber is alleged to have "[p]rovided in-person driver support services … to Uber's drivers." Compl. ¶ 13.D. Not only was this Hub location closed at the end of 2021, Love Decl. ¶ 10, none of the employees who worked there or otherwise reside in this District have knowledge of the research, design, and development activities relating to the accused functionalities. *Id.* ¶¶ 9, 11; Bidyuk Decl. ¶¶ 25-26. With that Hub's closure, there are no Uber facilities or offices and only a small number of Uber employees in the District, all of whom work remotely. Love Decl. ¶¶ 9-11. The relevant engineers and facilities are located predominantly in the Northern District of California and none are located in Texas. *Id.* ¶ 8; Bidyuk Decl. ¶¶ 7-19, 24-25 .

### 2. Third Party Witnesses and Evidence Relevant to the Alleged Infringement Are Located in the Northern District of California

LBT II's complaint implicates relevant third-party witnesses and evidence located in the Northern District. For each Asserted Patent, LBT II appears to accuse location determination functionalities provided by the Android and iOS operating systems running on rider and driver mobile devices via Google and Apple location APIs. Compl. ¶¶ 65-68, 80-84, 100, 115, 116, 122, 126, 127; Bidyuk Decl. ¶ 27. LBT II also alleges for the '355 Patent that "Uber uses various third-party … map software applications to provide the visual representation" of the claimed graphical mapping tiles. Compl. ¶ 124. Uber receives mapping services via additional Google APIs. Bidyuk Decl. ¶ 27. The Google APIs are likely designed and developed by Google employees located in

the Northern District, where Google's headquarters are located. Exs. 10-15. Uber has no control over these APIs or the associated mapping or location services, and had no role in the design or development of these APIs. Bidyuk Decl. ¶ 27.

Other third-party components and services implicated by LBT II's complaint include GPS, satellite, cell tower, and Wi-Fi signals used in location determination, as well as the "GPS system" (i.e., GPS chip) included in riders' and drivers' mobile devices. *See, e.g.,* Compl. ¶¶ 67, 68, 82, 24, 116. Uber is not aware that any of these components and services are designed, developed, manufactured, or controlled by third parties in this District.

> **3.      Other Witnesses and Evidence Relevant to Patentability,**
> **Enforceability, Damages, and Defenses Are Located in California**

LBT II has no physical presence in this District and does not allege that any relevant evidence or witnesses, beyond inventor Joe Scalisi, resides in this District or elsewhere in Texas. Compl. ¶ 33. Rather, key evidence and witnesses relating to the conception, reduction to practice, patentability, enforceability, and assignment of the Asserted Patents are most likely located in California, or at least far closer to the Northern District than to this District. Inventors Desiree Mejia and Roger Anderson appear to reside, respectively, in Orange and Los Angeles Counties in Southern California. Exs. 16, 17. Inventor David Morse (CEO of LBT Inc.) appears to reside in Oregon, Ex. 18, while Michael Beydler appears to live in Hawaii, Ex. 19. When the Asserted Patents were filed, all five inventors resided in California and were employed by LBT Inc. *See* Dkt. 1-D ('355 Patent) at 1. And two of the Asserted Patents' prosecuting attorneys, Robert Gazdzinksi and Robert Kasody, are in San Diego and Los Angeles, respectively. Exs. 21-22.

LBT Inc.'s principal place of business is Irvine, California, with employees and Directors located in California and Oregon. Ex. 23 at 1, 7; Exs. 16, 18, 24, 25. Other than (allegedly) Mr. Scalisi, no relevant LBT Inc. witnesses appear to reside in this District or elsewhere in Texas.

Instead, most of the evidence and witnesses with knowledge of LBT Inc.'s assignment of the Asserted Patents and LBT II's formation, funding, and other financial information relevant to damages and equitable defenses are likely in California or nearer to the Northern District than here.

The complaint and '355 Patent repeatedly refer to the PocketFinder product developed by LBT Inc. Compl. ¶¶ 33-37; '355 Patent at 9:37-40 ("The Pocketfinder service may be activated 104 for a tracking device 102 as well as provide user access to account Services that are part of the location and tracking service."). LBT II alleges that LBT Inc. was approached by Apple in 2011 about a "contract to launch the PocketFinder® as an Apple product." *Id*. ¶ 37. Although the parties allegedly discussed this possibility for a year, an agreement never came to fruition because "Steve Jobs passed away." *Id*. Thus, Apple, in the Northern District, likely has evidence relevant to damages and patentability, including information about the claimed inventions, first public disclosures or sales, potential prior art, and/or valuations of the Asserted Patents.

LBT Inc.'s public SEC filings also identify several competitors in the Northern District and elsewhere in California. Qualcomm's pet-tracking spinoff, Tagg, was acquired by Whistle Labs, Inc. in San Francisco in 2015. Ex. 23; Ex. 26. Wherify Wireless, Inc.'s Springboard Location Based Software platform was also developed in the Northern District. Ex. 27 at 6. And Magellan GPS is in Santa Clara, CA in the Northern District. Ex. 28. Other competitors located in Southern California, Ex. 23 at 28, and therefore within the Northern District's subpoena power, include LiveView GPS in Valencia, Ex. 29, and Meitrack USA in Pomona, Ex. 30.

Uber has also identified several third-party witnesses in California associated with prior art that Uber plans to include in its preliminary invalidity contentions. For instance, Qualcomm Corp. in San Diego was very active in the geolocation determination space around the time the Asserted Patents were filed. Exs. 31-32. Potentially relevant prior art developed by Qualcomm engineers, and associated fact witnesses, are located in California. Ex. 33. Other potential prior art systems

include the ParcTab Mobile Computing System, Exs. 34-36, which was developed in Palo Alto by individuals still residing in the Northern District, Exs. 37-41; the GPS used in Seiko Epson's Locatio GPS-equipped PDA developed by Trimble in Sunnyvale, Ex. 42; and Magellan's MAP140 GPS product developed in San Dimas, Ex. 43. All of these sources are either in the Northern District or within its subpoena power.  Uber has not identified any sources of prior art evidence or witnesses in this District.

III.   **LEGAL STANDARD**

Section 1404 allows a district court to transfer a case to any other district where it could have been brought for "the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). If the case could have been brought in the destination venue, the Fifth Circuit considers "private" and "public" factors to decide whether to grant transfer. *In re Volkswagen of Am., Inc*., 545 F.3d 304, 312 (5th Cir. 2008) ("*Volkswagen II*"). The private factors are: (1) the relative ease of access to evidence; (2) the availability of compulsory process; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make a trial easy, expeditious and inexpensive. The public factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in the case; (3) the familiarity of the forum with the relevant law; and (4) the avoidance of conflicts-of-laws problems.  *In re TS Tech USA Corp*., 551 F.3d 1315, 1319 (Fed. Cir. 2008); *see also Volkswagen 1*, 371 F.3d at 203.  LBT II's choice to file this action in this District is not an independent factor within the § 1404(a) analysis and cannot be considered. *Volkswagen II*, 545 F.3d at 314 n.10; *see also In re Nintendo Co*., 589 F.3d 1194, 1200 (Fed. Cir. 2009).

IV.   **ARGUMENT**

A.   **This Litigation Could Have Brought in the Northern District of California**

Under 28 U.S.C. §1400(b), a claim of patent infringement "may be brought in the judicial

8

district … where the defendant has committed acts of infringement and has a regular and established place of business." As LBT II admits in the complaint, Uber's principal place of business is in the Northern District of California. Compl. ¶ 4.

Alleged "acts of infringement" also occurred in the Northern District. For instance, the accused functionalities, including those provided by the Uber Driver and Rider applications, were designed, developed, tested, and implemented in the Northern District. Bidyuk Decl. ¶¶ 7-9. LBT alleges that Uber committed acts of infringement in the Northern District, e.g., by "using computerized methods for coordinating and providing ride-hailing and food delivery services" and "making, having made, and using systems, methods, and computer program products and related services for coordinating, controlling, and providing ride-hailing services." Compl. ¶¶ 60, 76, 93, 109. Thus, LBT II undeniably could have filed this suit in the Northern District.

### B. The Private Factors Weigh Heavily in Favor of Transfer

#### 1. Sources of Evidence Are Far More Accessible in the Northern District

The first private factor focuses on the relative ease of access to non-witness evidence, e.g., documents and other physical sources of proof. *In re Apple Inc.*, 979 F.3d 1332, 1339 (Fed. Cir. 2020). Of "critical and controlling" importance is the location where the accused products and functionalities were researched, designed, developed, and tested. *Affinity Labs of Tex., LLC v. Blackberry Ltd*., 2014 WL 10748106, at *6 (W.D. Tex. June 11, 2014); *see also XY, LLC v. Trans Ova Genetics*, LLC, 2017 WL 5505340, at *13 (W.D. Tex. Apr. 5, 2017). In *Affinity Labs*, the Court looked to the "center of gravity of the accused activity" and found that the trier of fact ought to be ***as close as possible*** to the place where the infringing device was developed and produced. 2014 WL 10748106, at *6 (emphasis added).

Here, the Northern District is clearly the accused "Uber Platform" functionalities' "center of gravity": the vast majority of the relevant research, design, and engineering efforts occurred in

Uber's Bay Area facilities, and continue to be improved and updated there. Section II.B.1, *supra*; Bidyuk Decl. ¶¶ 7-9. Likewise, documents and physical evidence relevant to the accused functionalities are also created and maintained in the Northern District by members of the Driver, Rider, Maps, Location, Trip Context, and Sensor Mobile Teams. *Id*. ¶ 20. And relevant documents and evidence were created and maintained by product marketing and finance teams at Uber's Northern District headquarters. *Id.* ¶¶ 21-23. Thus, the relevant sources of evidence from Uber are likely to be far more accessible in the Northern District than in this District. *See, e.g.*, *In re Google LLC*, No. 2021-178, 2021 WL 5292267, at *2 (Fed. Cir. Nov. 15, 2021) (district court erred in not "considering the location of document custodians and [] where documents are created and maintained, which may bear on the ease of retrieval").

LBT II's allegations also appear to implicate location services from Google and Apple and mapping services provided by Google. *See* Dkt. 18 at 12-14. Because Google's and Apple's headquarters are in the Northern District, relevant evidence about those services is likewise expected to be in the Northern District and thus far more accessible than in this District. *See Parus Holdings Inc. v. LG Elecs. Inc*., 2020 WL 4905809, at *3 (W.D. Tex. Aug. 20, 2020) (sources of proof factor "weighs towards transfer" when the accused product uses Google technology and the bulk of Google's relevant documents will be in NDCA); *see also* Exs. 10-15.

By contrast, LBT II has not alleged the presence of any evidence in this District. Public records suggest that most, if not all, sources of evidence on the Asserted Patents' conception, reduction to practice, prosecution, patentability, enforceability, and assignment exist in California with the majority of the inventors and LBT Inc. *See* Section II.B.3, *supra*. Likewise, evidence relating to the formation and funding of LBT II, relevant to damages and other defenses, is also likely to reside with LBT Inc. and its employees and directors in California. *See* Section II.B.3, *supra*.  Even evidence relating to actual and potential deals for, sales of, or competitors to LBT

Inc.'s PocketFinder product and technology are likely to be found in the Northern District or in Southern California with LBT Inc. *See* Section II.B.3, *supra*. These sources of evidence are undeniably more accessible from the Northern District.

Because there is no relevant evidence in this District and an overwhelming amount in the Northern District, or close nearby, this factor weighs strongly in favor of transfer.

### 2.  The Northern District Can Subpoena Third Party Witnesses

The Northern District is also the preferred district for this case because it has subpoena power over relevant third-party witnesses. A court can only compel a witness to attend trial if the witness "resides, is employed, or regularly transacts business" less than 100 miles from the court, or if the witness "resides, is employed in, or regularly transacts business" in Texas and is either a party's officer or is commanded to attend trial without incurring substantial expense. Fed. R. Civ. P. 45(c)(1). When "more third-party witnesses reside within the transferee venue" than the current venue, this factor strongly favors transfer. *Affinity Labs*, 2014 WL 10748106, at *5 (citing *Fujitsu Ltd. v. Tellabs, Inc.*, 639 F. Supp. 2d 761, 767 (E.D. Tex. 2009)).

Most of the third-party witnesses expected to testify at trial are in the Northern District or elsewhere in California, and thus within the subpoena power of the Northern District.  For instance, Google and Apple employees knowledgeable about the location and/or mapping API services provided to Uber and relevant to the accused functionalities are expected to reside in the Northern District. *See* Section II.B.2, *supra*. And because the accused Uber Platform functionalities were designed and developed at Uber's Bay Area facilities, it is likely that former Uber employees who may be called to testify also reside near Uber in San Francisco. *See Kleiner v. Sw. Air. Co.*, 2008 WL 4890590, at *4 (W.D. Tex. Nov. 4, 2008).

Similarly, a large pool of third-party witnesses reside in Southern California's Orange, Los Angeles, and San Diego Counties. These include at least two of the Asserted Patents' inventors,

two patent attorneys that prosecuted the Asserted Patents, and many of LBT Inc.'s employees and Directors (present and past). *See* Section II.B.3, *supra*. LBT Inc. has also identified multiple competitors in the Northern District and Los Angeles or San Diego Counties where evidence and employees with knowledge of potential prior art references and systems may be located. These include Qualcomm Corp. in San Diego; Qualcomm's spinoff, Tagg, which was acquired by San Francisco-based Whistle Labs, Inc.; Magellan GPS in San Dimas; LiveView GPS in Valencia; and Meitrack USA in Pomona—all of which are expected to have potential witnesses in or nearest to the Northern District and its trial subpoena power. *See* Section II.B.3, *supra*. And finally, as noted above, Uber has identified several third-party witnesses associated with potential prior art that Uber plans to include in its preliminary invalidity contentions. These include ParcTab Mobile Computing System developed in Palo Alto, the GPS used in Seiko Epson's Locatio developed in Sunnyvale, and Magellan's MAP410 developed in San Dimas. *See* Section II.B.3, *supra*. Trimble and Magellan are still headquartered in California, which is where any subpoena will be served.

As such, this second factor weighs strongly in favor of transfer.

### 3. The Cost of Attendance for Willing Witnesses Is Far Less Burdensome in the Northern District

The "cost of attendance factor" is "the single most important factor in the transfer analysis." *Parus*, 2020 WL 4905809, at *5 (citing *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009)).  The Fifth Circuit uses the "100-mile rule," i.e., when the current trial venue is more than 100 miles from the proposed transferee venue under § 1404(a), the "inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *See Apple*, 979 F.3d at 1341. The Court may ***not*** discount the inconvenience and cost of attendance for employee witnesses under this factor. *See Volkswagen I*, 371 F.3d at 204.

Because most witnesses are in the Northern District, the time and costs associated with

travel to Waco strongly favor transfer. Other than potentially Mr. Scalisi, no witnesses appear to reside in this District or elsewhere in Texas. *See* Section II.B, *supra*. By contrast, all of Uber's witnesses, and several of LBT II's witnesses, reside in the Northern District or in Southern California. The vast majority of party witnesses, flying from San Francisco or nearby airports, would, therefore, have to travel 1800 miles and more than 10 hours roundtrip. Exs. 44-45; *see, e.g.*, *In re Google LLC*, 2021 WL 4427899, at *4 (Fed. Cir. Sept. 27, 2021) (without a major airport in or near Waco, "time is a more important metric than distance" for the cost and convenience of travel). Third-party witnesses coming from the Northern or Central Districts, including Google and Apple witnesses, would similarly have to travel 1800 or 1400 miles, respectively. Exs. 44-47. By contrast, traveling from Orange County to the Northern District would take less than 3-4 hours, Exs. 48-49.

As the Federal Circuit explained in *In re Uber Technologies, Inc.*, the presence of these identified party and third-party witnesses in the Northern District must be afforded significant weight, especially given that only one witness has been alleged to reside in or near the Western District of Texas. 852 F. App'x at 543-44. Because traveling to the Northern District of California would be significantly less burdensome than traveling to this District for almost all witnesses identified to date, this third factor weighs heavily in favor of transfer.

### 4.    Other Practical Considerations for Transfer Are Neutral

The final factor considers "other practical problems that make a trial of a case easy, expeditious, and inexpensive." *Volkswagen II*, 545 F.3d at 315. This case is still in its early stages. The *Markman* hearing will not occur for five months, and thus transfer will result in little if any delay. Thus, this factor is neutral.

C.     **The Public Factors Also Weigh in Favor of Transfer**

1.     **Administrative Difficulties Relating to Court Congestion Slightly Favor Transfer to the Northern District**

The "time to trial" metric is the "most speculative" of the considerations for transfer. *In re Genentech,* 566 F.3d at 1347; *DataQuill, Ltd. v. Apple Inc.*, 2014 WL 2722201 at *4 (W.D. Tex. June 13, 2014) (first public interest factor was neutral because "[a]ttempting to accurately understand another court's docket from the outside is always a difficult task"). This is particularly true for this division of the Western District, which carries approximately 816 active patent cases but schedules trial to begin one year after the *Markman* hearing. The Northern District, on the other hand, has 19 judges to share a total of 215 active patent cases. For this reason, the Federal Circuit has reiterated that "a court's general ability to set a fast-paced schedule is not particularly relevant to this factor." *Apple*, 979 F.3d at 1344; *see also In re Adobe Inc.*, 823 F. App'x 929, 932 (Fed. Cir. 2020) (district court "ran afoul of governing precedent in giving dispositive weight to its ability to more quickly schedule a trial"). Thus, to the extent this factor is relevant, it slightly favors transfer to the Northern District.

2.     **Local Interests in Having Localized Interests Decided at Home Weigh in Favor of Transfer to the Northern District**

The Northern District has a strong local interest in resolving this case because Uber's headquarters and key research and design facilities are located there. *See Affinity Labs*, 2014 WL 10748106, at *3 ("The district where a party has its principal place of business typically has a stronger local interest in the adjudication of the case."); *Wireless Recognition Techs. LLC v. A9.com, Inc*., 2012 WL 506669, at *6 (E.D. Tex. Feb. 15, 2012) (local interest factor favors transfer where defendant is headquartered, developed the accused products, and employs a large number of people in the transferee venue); *see also In re Uber*, 852 F. App'x at 543-44 (rejecting the district court's conclusion that the local interest factor was neutral despite its recognition that the

14

accused functionality was researched, designed, and developed in the transferee venue).

By contrast, this District has no apparent local interest in the resolution of this case. Indeed, LBT II has no presence in or connection to this District beyond the very recent, alleged arrival of a single inventor, Mr. Scalisi. But the presence of a single inventor in the District cannot outweigh the significant numbers of witnesses and employees in the Northern District and elsewhere in California. *See Wireless Recognition*, 2012 WL 506669, at *6.  In *In re Uber*, the Federal Circuit warned against giving weight to a party's "plainly recent, ephemeral, and artificial" presence in the District as "the sort of maneuver in anticipation of litigation that has been routinely rejected" in venue determinations. *In re Uber*, 852 F. App'x at 543-44. LBT II's allegations do not evidence any local interest because none are specific to this District. *Wireless Recognition*, 2012 WL 506669, at *6 ("Interests that 'could apply virtually to any judicial district or division in the United States,' such as the nationwide sale of infringing products, are disregarded in favor of particularized local interests.").

> **3.     The Other Public Factors Slightly Favor or Are Neutral to Transfer to the Northern District**

Because both districts are experienced with patent law, and because there are no concerns about conflicts of law or the application of foreign law, these factors are neutral.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Uber respectfully requests that the Court transfer this case to the Northern District of California under 28 U.S.C. § 1404(a).

Dated:  February 25, 2022

        _/s/ Luann L. Simmons_

Luann L. Simmons (*Admitted Pro Hac Vice*)
lsimmons@omm.com
Betelhem Zewge Gedlu (*Admitted Pro Hac Vice*)
bgedlu@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
Telephone: 415-984-8700
Facsimile: 415-984-8701

Ryan K. Yagura (Tex. Bar No. 24075933)
ryagura@omm.com
Nancy L. Schroeder (*Admitted Pro Hac Vice* )
nschroeder@omm.com
James Yang (*Admitted Pro Hac Vice*)
jamesyang@omm.com
**O'MELVENY & MYERS LLP**
400 S. Hope Street
Los Angeles, California 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407

Eberle Schultz (*Admitted Pro Hac Vice*)
eschultz@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower
7 Time Square
New York, New York 10036-6537
Telephone: 212-326-2000
Facsimile: 212-326-2061

***Attorneys for Defendant Uber Technologies, Inc.***

### CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on February 25, 2022, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

 */s/ Michael O'Donnell*
Michael O'Donnell
